Alright, I'm going to let you pronounce your name because there's a 50% chance that I'll get it wrong. Thank you. Michael Heidler. Mr. Heidler? Yes. May it please the Court, Michael Heidler for Trinseo. Your Honors, to show why the District Court erred in nullifying the jury's reasonable royalty fact-finding, I'd like to begin by reviewing three cases that address the legal principles governing reasonable royalty damages, and then explain how the evidence from this two-week trial, viewed in the light most favorable to the jury's verdict, comports with those and provides a legally sufficient evidentiary basis for the jury's finding that $50 million is a reasonable royalty for licensing these four trade secrets and no more. The first case is this Court's decision in University Computing, where this Court explained that every trade secret case is controlled by its own peculiar facts and circumstances and requires a flexible and imaginative approach to the problem of damages. And other courts have adopted imaginative and flexible approaches to reasonable royalty damages based on the peculiar facts of the trade secret case. For example, in O2 Micro, the plaintiff's expert provided a lump-sum damages figure assuming misappropriation of all 11 asserted trade secrets. So the Court issued multiple pretrial warnings to the plaintiff. You can do that, but if you don't win on every trade secret, you'll have no damages. Well, the jury came back and found that only 5 of the 11 were misappropriated, but with the hindsight of the evidence, the Court adopted a flexible approach to damages and awarded a reasonable royalty because the plaintiff's expert had testified that the royalty amount would be the same for any group of misappropriated trade secrets. Similarly, in the Bishop case, the plaintiff's expert gave a lump-sum damages number assuming misappropriation of all 13 asserted trade secrets. Well, the jury finds only 3 were misappropriated, but the Court held that the evidence was sufficient to support the reasonable royalty because within the asserted trade secrets, there was a tipping point. A core of the technology was required for the system to be economical. The jury in this case heard evidence like that in O2 Micro and Bishop, evidence that enabled the jury to find that KBR misappropriated Trinzio's core trade secrets. And to put this evidence in context… So why did Judge Hainan give you the stern warning that your all-or-nothing approach was a gamble? The same reason that the judge in O2 Micro gave that kind of a warning because initially the judge thought you have to have this kind of strict affordment where you ascribe a particular quantified dollar amount of damages to each trade secret. But in hindsight, the judge in O2 Micro looked at the evidence and said, wait a second. That's not what the law requires. The law requires a flexible and imaginative approach to damages. And where you have testimony that the royalty amount would be the same for a particular group of misappropriated trade secrets, that's good enough. That's a flexible and imaginative approach that deals with the peculiar facts of the case. In our case, we have similar evidence. So if you go back before trial, Trinzio's technical expert, Jerry Duane, he publishes a report and he says KBR misappropriated 11 Trinzio trade secrets. He then issues a supplemental report where he reduces the number of asserted trade secrets from 11 down to 10. But Trinzio's damages expert, Thomas Pastore, had already developed his $80 million reasonable royalty damages model based on the assumption in Duane's first report that KBR misappropriated 11 trade secrets. So Pastore never changed his opinion. And he was asked about this at trial. I've reproduced his testimony on tab three of my oral argument exhibits. This is ROA 11928. He's asked, and after receiving that report and that confirmation from Mr. Duane, you did not supplement or change your opinions in any way, correct? Answer, no, it wasn't necessary for me to change my opinions. Here's the key language. It's still the core technology in his original report and in his revised report. Question, so your number was $40 million per train. It's an $80 million damages model covering two trains. $40 million per train before his concession and it's $40 million per train after his concession. Is that correct? That's correct. The jury was entitled to understand the story to be saying that his reasonable royalty damages model would not change as long as KBR misappropriated these core trade secrets. And the evidence at trial enabled the jury to identify what were Trendzio's core trade secrets on tab three of my oral argument, sorry, tab two of my oral argument exhibits. Jerry Duane is asked whether any trade secrets or asserted trade secrets, quote, form the core of the value of Trendzio's PC technology. Let me stop you and ask you a more basic question. Just dial it back for a moment. We've got a four week jury trial, right? Very complex issues, world class lawyers, obviously. On all issues here, I don't see issues about jury charges. So, we've got a four week trial, complex issues, world class lawyers, veteran trial judge. None of the issues in here about the jury got derailed because of defective instructions, objections about the pre-trial conference, none of that. Yet, all of y'all are here and neither side is happy. Neither side is happy. Ordinarily, it might be, okay, the judge refused to give this charge, so that's what made the jury do X. None of that's here. So, in effect, it's almost a re-argument of the whole case before us. In effect, with all the stuff you put in here, in effect, arguing almost a no vote to us so we have a four week. This isn't summary judgment. I'm just sort of dialing back the first principles. You're each asking us, you know, either flip it or whatever. So, embedded in that, number one, to say from your standpoint of the expert, if the jury heard the experts, et cetera, et cetera, trying to find where's the error. Somebody has to turn on credibility, et cetera, et cetera. So, just within core basics, not that you're happy, but where's the reversible error in terms of the standard review vis-a-vis that piece? Do you follow what I'm saying? Yes, Your Honor. So, the standard review, of course, is very deferential to the jury's verdict. This jury sat through a two week trial. They deliberated for three days. They sent out 10 notes. The jury did its job and the jury awarded Trinzio, my client, $50 million. Post-trial, Judge Hayman writes a JMOL order where he says, gee, they really misappropriated your technology. They said KBR's challenge is to liability. I think he used the word meritless. He said there's abundant evidence to support the liability findings. So, is your core argument that Judge Hayman usurped the jury verdict? Absolutely, Your Honor. That is our core. In the Parker drilling opinion that you wrote probably 10 years ago, you may not remember, but that's exactly what you said. Flattery will get you nowhere. I mean, it just absolutely, I don't even remember. Rule 50, the jury has the prerogative to weigh the evidence, to balance the evidence, and to make the findings. And the evidence in this case fully supports the jury's $50 million reasonable royalty damages finding for Trinzio. And really important evidence is his testimony from Jerry Duane. You talk about how does the jury read the evidence? Okay, on tab three, tab two, Jerry Duane is identifying Trinzio's core trade secrets. And the first one he mentions is the oligomerization reactor. This is one of the trade secrets that KBR misappropriated. And on tab three, you can see the structure of his answer. He identifies the oligomerization reactor as his core trade secret, and then he tells the jury what element it includes. He says the containment system associated with it. He does the same thing for his next core trade secret. He identifies the core trade secret as the entire DEVOL process, which is another one of the trade secrets that KBR misappropriated. He then tells the jury what elements that trade secret includes. He mentions the atomization nozzle and the agglomerator, which is also called the snake. All right, but then remind me, how does Judge Shane's JMOL deal with that? What's, it's just, I've read all this a long time ago trying to get prepared. But in effect, you're saying JMOL is wrong as a matter of law. You got the evidence. So the standard review is very differential to verdict. The issue before your honors, I think, really is a de novo legal question, though. What type of evidence does a plaintiff need to establish trade secret damages in a case like this? Well, but I'm trying to see if the issue is whether or not this reversible error in the judge's JMOL because of the deference to a jury verdict. And so I'm trying to understand, not missing sight of all the other issues argued, but I'm just at the core principles. You got a four-week trial, and afterwards the judge renders a JMOL as if this was a case trial. We're not judging it. I'm just trying to appraise it. And so I'm saying, stacked up against deference to a jury verdict, a JMOL, and you're saying, here's the signal testimony that's in here. I'm just saying, how does the JMOL deconstruct what you just read? There's two ways, your honor. So first of all, Judge Hanen thought that we needed evidence to place a dollar value on each misappropriated trade secret. We don't think that theory is supported in the law. It's not the theory that this court endorsed in university computing. It's not required in these other cases, Bishop and O2 Micro. The second thing that Judge Hanen did, and where I think he did usurp the jury's prerogative, when he talks about this testimony here on tab two, that what is the core trade secrets, he interprets the testimony in a way that would undermine the jury's verdict. He interprets Jerry Duane to be saying that there are five different core trade secrets. Well, first of all, that's not the only way to read this testimony. The jury could have read this testimony to be referring to the oligomerization reactor and the DEVOL process. And so the jury didn't have to adopt that reading. The other thing that he missed is the jury's not required to believe any expert or any witness. Under Rule 50, the jury can reconcile conflicting testimony and make the findings based on the entire record. So that's important because the last thing that Jerry Duane identifies is a thermal stabilizer. Well, there was hotly disputed back questions at trial about whether this was one of the core trade secrets. And KBR persuaded the jury to find that it's not. And so viewing the trial evidence in the light most favorable to the jury's verdict, the jury could have said that the core trade secrets are these first two that Jerry Duane identified, the oligomerization reactor and the steam DEVOL process. So that's where I think Judge Hanen lost sight of the evidence and the jury's prerogative. And the jury had other evidence that would show that these are the core trade secrets. And so the reasonable royalty damages model that Thomas Pastore gave would apply to misappropriation of these core trade secrets. If you look on tab four, KBR has a marketing letter where it emphasizes parts of this technology. It emphasizes the continuous plug flow reactor. Okay. Well, on tab one, the jury verdict, this is item number four, continuous plug flow oligomerization reactor. That is Jerry Duane's first core trade secret. KBR also emphasizes the snake system slash DEVOL systems. Okay. And they use a slash because again, the DEVOL system has this snake or agglomerator as one of its elements. Well, that's Jerry Duane's second core trade secret. If you look on tabs five and six, I won't read it, but one of the defendants, Steve Harper explains that the steam DEVOL process in particular, one of these misappropriated trade secrets is the heart and core of the Dow technology because it is what differentiates Dow from all of the other companies in the industry. It is the only PC technology that can produce this polycarbonate flake that everyone in the industry was trying to get. On tab seven, Steve Harper gives his, he's referring to a competitor who claims he can produce the polycarbonate flake. And Steve Harper says it would be interesting to see how he could produce the flake unless he has stolen the DEVOL technology. So looking at all of this evidence, the jury could have said the core trade secrets are the oligomerization reactor and the steam DEVOL process. The jury then could have valued those core trade secrets using Thomas Pastore's reasonable royalty damages model. And importantly, looking to the university computing factors for a reasonable royalty. On tab eight, you can see I've excerpted negotiations where parties agreed to prices in the range of the $25 million per train that the jury awarded here. That's one of the university computing factors. A really important university computing factor is foreseeable changes to the party's competitive costumes. And this is crucial because remember, Trinzio not only held licenses to this technology, it also manufactured the polycarbonate itself in its Stata plant and its Freeport plant. So the evidence shows it was very hesitant, very reluctant to grant licenses that would put more capacity on the market and undermine Trinzio's competitive position. It didn't want to do that. From Trinzio's perspective, whether it's licensing two trade secrets or 10 trade secrets, if it's licensing the core technology that would enable a competitor to produce the polycarbonate in direct competition with Trinzio, the market impact on Trinzio's business is the same. So the jury could have looked at that and said, Trinzio is going to charge a high price for licensing these core trade secrets. The last university computing factor is other unique circumstances. Well, the jury heard no one has ever licensed this kind of technology piecemeal, piece by piece. Are you essentially making a compilation trade secret argument here today? We, I have not yet, but we do have a compilation trade secret as a matter of law. The STEAM-DVOL process meets the legal definition for a compilation trade secret, because it's a compilation of technologies. That's what it is. But isn't that what you're essentially arguing though, that they all work together and so you can't separate them out? For the STEAM-DVOL process and the oligomerationalization record, absolutely we have combination trade secrets. Well, then back to Judge Stewart's question, where's the jury charge on that? So I would refer the court to the Sykes case from this court, where the court held that there was a combination trade secret, even though the jury charge in that case, which was reproduced in the opinion, didn't include it in the structure. Because the undisputed facts of this case show that the STEAM-DVOL process is a combination trade secret. And that Sykes case is 655 F. 2nd, 731, 733. I see I'm out of time. Yes, you've saved time for rebuttal, Mr. Padley. Thank you. Mr. Harris? My pleas to the court. My name is Warren Harris. I represent KBR. Trenzio made a deliberate choice not to allocate value among its 10 alleged trade secrets, because it wanted the jury to award one lump sum damages number. The district court repeatedly warned Trenzio its all-or-nothing damages approach was risky. If the jury rejected even one of the 10 alleged trade secrets, there would be no evidence of damages. But Trenzio wanted a windfall, so it decided to gamble, and it lost. Trenzio presented 10 alleged trade secrets. The jury found only four. It's undisputed that Trenzio offered no evidence of damages as to just those four trade secrets. So the district court promptly rendered a take-nothing judgment. There are two primary legal principles that are in play here. One deals with apportionment. The other deals with the entire market value rule. And I will talk about those in order. The testimony of Trenzio's damage- Well, first of all, what do you do with university computing in terms of the relationship between the law here and the law of patent infringement? This court in university computing said that you look to patent law to determine damages in trade secret cases. And then it went on to talk about reasonable royalty and unjust enrichment and talked about apportionment. I mean, those principles are quoted on page three, I believe, of Trenzio's reply brief. And so I think the framework is set here, and I think that's the framework that controls. Let me address one point about Judge Hanen before I turn back to the apportionment. Trenzio was arguing that Judge Hanen required that each trade secret be apportioned. You have to have a value for- That's not what Judge Hanen said. On page 17 of his opinion, which is at 38662, it says, the plaintiff must provide either evidence that apportions value per trade secret or evidence that provides some methodology or guidance for how the jury may do it itself. Neither was done here. We also, and this is on page three of Trenzio's reply, right after going through university computing, they say, but that's not what Judge Hanen did here. He applied this concept of strict apportionment, and they have two record sites. Both of those are to Judge Hanen's opinion. One is where he says Trenzio is arguing about strict apportionment, and then another one is where they're kind of characterizing the law. Judge Hanen didn't require any strict apportionment rule. He applied apportionment as required under the law. So now let's turn to what Trenzio's evidence was on that. The testimony of Trenzio's damages expert, Thomas Pastore, was no evidence because it was improperly inflated in two different ways. First, his damages model was based on misappropriation of all 10 claimed trade secrets. He offered no testimony valuing the four that the jury found, either individually or as a group, and no methodology for the jury to calculate damages on less than all 10. He could have done this a couple of ways. He could have said, here they are one at a time. I'll give you the value of all 10. He could have said, here are the value of the 10 collectively. Let me break this up on a pro rata basis. Or he could have said, here are the 10. Let me put these in groups, as is sometimes done in cases, and value those. He did none of that. He even admitted he had no opinion that would allow the jury to calculate a reasonable royalty for less than all the trade secrets. And second, even if the jury had found in Trenzio's favor on all 10 trade secrets, Trenzio's damages evidence included value associated with information that Trenzio never even claimed as a trade secret. Pastore based his reasonable royalty testimony on the value of Trenzio's entire polycarbonate process. But the alleged secrets form only a small part of that overall process. On page 42 of our open brief, there is a chart. And you see five different blocks that are just a high level overview of the polycarbonate process. The trade secrets at issue here go only to the first and third block. It's only part of two of the five pieces. But yet, everything that Pastore is talking about is the entire process. Pastore admitted that several aspects of Trenzio's technology were not trade secret. And he made no attempt to account for the value of that public information in his testimony. So Pastore's errors left the jury unable to perform its task in calculating reasonable royalty damages. And that's what Judge Hannon found in granting judgment as a matter of law. Well, let me just beg you. You heard my earlier question. It's just, you know, way back when, I mean, I was a trial judge. I'm a federal trial judge. But I mean, same principles. And you heard me say, there's no objections here about charges. I mean, plaintiff gets to try his or her case the way they try. I hear you saying he could have done this, he could have done that. Fine. I haven't read all this in here. But I look for particular things. And I don't see this. And so I'm like, where's Judge Hannon getting reliant on, say, you got to do this? The jury zeroed him out because he didn't do that. Fine. They wouldn't be here. But it's hard for me to get my head around going from 50 million to zero on a JMOL in a four-week jury trial with world-class lawyers where I don't have charge conference objections, jury charge objections, rejections of the expert, competing expert testimony, et cetera, et cetera. So at a minimum, I mean, I haven't decided the case. I'm just telling you. But to go from 50 million to zero, like somewhere in there, OK, was the JMOL beat? Nope. I'll give you a new trial on damages. Start over again or something. But it's the 50 to zero point, that's just hard to get the head around. I mean, you did it wrong. But here's the deal. I don't know. I mean, I know you like the result. I'm just trying to understand an ordinary trial process, how this gets to a JMOL, that's a screeching heart, to zero. Even if they fumble the ball in terms of how they proved it and all that. Nope. You don't get to that. But I guess you're telling me he picked his strategy and it was all wrong, right? He did it on the law, Your Honor. Let me try to walk through this. There are a couple of issues with the jury charge. I'll get to those in a minute when I get to the entire market value rule. And you talked about no one objecting to experts. Oh, there was an objection to experts. Mr. Pastore, there was a motion filed a year before trial, a Dobber motion to exclude his testimony because he didn't apportion damages. That is required under the law. That was a real problem. And Judge Hannon told him when he granted that order, it was, that order was granted November, trial was in January. Judge Hannon told Trenzio, you're going to have a problem here if you don't win on all gen trade secrets. I'm going to let your witness testify because if you went on all 10, then there's damage as evidence. But because you have to break out what, like here, the jury found four of 10. There is no evidence. And Pastore admitted he did not even attempt to put on evidence of the value of any subset, let alone the four that the jury found. That's the problem. And the evidence, the way he put it on, doesn't even allow the jury to do its work to come up with the number. And I'm going to come to another doctrine in a minute that's in play here. So there was a problem with the expert. Trenzio was warned about this before trial. Trenzio stood its ground, didn't say, Judge Hannon, I'm surprised at this. Judge Hannon, we need more time to change our expert opinion. When Judge Hannon put Trenzio on notice, it did nothing. And it went to trial with this expert, and Judge Hannon told Trenzio, you're taking a gamble here. Because let me tell you what's going to happen if you get an answer of less than 10 trade secrets, and that's exactly what happened. So that's the framework. There is a problem with the expert. The whole problem here is with the expert. That's where all this starts. So rather than exclude him totally underdog, but he spits the baby and says, OK, it's a problem. I won't exclude him. You're out. I'll let him testify. But if his testimony doesn't measure up, you're wide open. And there are other cases that we cite in our brief where the judges are doing that. Sometimes they exclude them. What I think Judge Hannon did was actually right, because they could have won all 10. And if they would have won all 10, it would be a different story. But they didn't. And Judge Hannon put them on notice, and they decided to take that position. They took the gamble, and they lost. And that's why we're here now. So this deals with apportionment. Let me now turn to this concept of entire market value rule. Because the general rule is, when you have one piece of a multi-piece trade secret or patent, you have to break down the damages as to each of those pieces. The jury, in fact, was instructed exactly on that. The instruction said on the reasonable royalty that the reasonable royalty must reflect the value attributable to just the trade secrets misappropriated and no more. So that's the framework we're working with. An exception to that is the entire market value rule. That's a very narrow exception to apportionment. And all of this argument that we've heard, and the evidence that was alluded to by Tremzio, deals with Jerry DeWayne testifying as to five alleged secrets that he said form the heart or the core of the value. That is an entire market value rule. So he's basically saying, these trade secrets drive all the value. And because of that, I get everything. But let me go back up to entire market value. On preservation, Tremzio never requested a jury instruction on that. And in fact, whenever KBR offered a jury instruction to get the jury properly instructed, Tremzio opposed it. Tremzio objected to a jury charge on that. It wasn't until after the verdict that Tremzio tried to invoke this theory. So the district court twice held that Tremzio waived the entire market value rule. Tremzio doesn't challenge those findings on appeal, so they forfeited that argument. So we shouldn't even be here talking about entire market value rule. But now let me turn to the merits of that. The district court correctly described Tremzio's heart core value driver as nebulous and of little significance, little legal significance. And under the cases like Laser Dynamics, to satisfy the entire market value rule, it's not enough that the trade secret is viewed as valuable, important, or even essential. Under the entire market value rule, it requires proof that the trade secrets constituted the basis for customer demand. You have to show that's why everybody is going to this product. Then that requires economic evidence. There's none of either here. There's no evidence of customer demand as to these trade secrets that will support the entire customer demand going to them. And there is no economic evidence. So let's look at what Jerry DeWayne testified to. He said that there were five trade secrets that form the heart or the core of the value. Excuse me. But the jury found that three of those were not even trade secrets. So here he is. He's saying these five, this is the core, the heart, the core of the value, which is not a legal term, but that's just his argument, which goes under the entire market value rule. And the jury said, no, it's the three. So three of those are out. There would have been value in those three that were out. So we know all the value isn't in what's left. And another clear example that we know not all of the value is in those five is if you look at Mr. Davis, who was also sued here by Trenzio. There were three trade secrets alleged against Mr. Davis, one of which is in these five. The other two aren't. Trenzio argued that there was hundreds of thousands of dollars of value in those three trade secrets. And the jury said, no, no, no, as to those three. We know there's other value out there for Mr. Davis. We know of these five that are the heart, core value. We know the jury said, no, it's the three of those five. And what we're left with is no combination of the four secrets the jury found can account for the entire market value of the technology. And again, that's the test. The entire market value has to come from the trade secrets they're alleging. Besides the fact they forfeited this argument by objecting to and opposing a jury charge on it, they haven't complained about the waiver argument. Judge Hayden found two different ways it was waived. They haven't complained about that. We shouldn't be here on appeal, but on the merits, the argument still fell. So, Your Honor, I hope that helps walk through why Judge Hayden got to where he did and why this isn't a split the baby, let's look at the range of evidence. Trenzio did not put on evidence to allow the jury to do its work here. Judge Ramirez, you asked about a compilation trade secret. Let me address that. This is another argument that Trenzio has raised after trial. The evidence that was here dealt with whether the individual secret stroke value, not whether they provided value from being compiled in a unique way. So there's 10 different trade secrets. There weren't things that were bundled. And the district court ruled on this expressly. The district court said that it could not find the compilation trade secret existed because the jury was simply not asked the question as to whether there was a compilation trade secret. The case that Trenzio cites, Bishop v. Miller, is a Texas Intermediate Court of Appeals decision dealing with a common law trade secret claim. The jury there found that the plaintiff owned a compilation trade secret of some or all of the 13 items listed in the jury charge. And as a result, the plaintiff didn't need to sign a value to meet. So that was where they actually went to the jury and got a question on whether there was a compilation jury charge. And here, no question was asked. And that's what Judge Hayden found. And because that's not how they tried the case and the jury simply was never asked the question, Trenzio has also forfeited that right. Let's see, I've got just a few seconds left unless the court has any additional questions. I'll give my remaining time back. All right. Thank you, Mr. Harris. Mr. Foster. Good morning, and may it please the court. I find myself in a slightly unusual position because all you've heard about so far this morning is reasonable royalty and my clients don't have a reasonable royalty damages number against them. There are a couple of things that I wanted to make sure the panel understood based on some language in Trenzio's reply brief. And these relate to the unjust enrichment damages theory in this case, which is the other theory running along in the lawsuit. In Trenzio's reply brief at footnote one, this is on page 34, Trenzio says that the $486,000 that Bill Davis got in connection with the work he performed should come out of the damages number. They say the jury found no liability against Mr. Davis, which is true. And they say that that work can properly be characterized as lawful. Now, Mr. Davis was an individual defendant in this case. And the jury found no liability. Mr. Davis was an independent contractor who worked for PCS doing hourly consulting services. PCS is one of my clients. And so this really puts a fine point on the apportionment issue. So if Mr. Davis is spending consulting hours working on an aspect of polycarbonate technology that the jury concludes isn't a trade secret, I think it's obvious that those hours have to come out. And Trenzio is conceding in their reply brief that those hours have to come out of the damages one. And you can take the Davis hours out because Trenzio put on evidence of how much time Davis spent working on the project. But then you turn to the other tech team members, the other independent consultants. They also work on the aspects of the technology that the jury found to be a secret and the aspects of the technology that the jury found not to be a secret. But there's no evidentiary basis in the record to take those hours out because Trenzio elected not to put on evidence that would allow the jury to differentiate value between the secrets. And this is because they wanted an all or nothing damages model because if you have an all or nothing damages model, you get a larger number if you win the gamble. And so they made the conscious choice to not tell the jury, okay, Steve Harper spent $200,000 worth of consulting hours on trade secret four. They elected not to put on that kind of evidence. They elected to make it impossible for the jury to do that apportionment. The other point that I wanted to make just briefly is this point about revenue versus profits. So Trenzio, with respect to my clients, only put on evidence of revenue. They didn't put on evidence of profits. Of course, since the model is unjust enrichment, the authority from the United States Supreme Court and from this court is that the damages measure for unjust enrichment is profits, not revenue. Trenzio's explanation is that there is a narrow equitable exception where you don't have to deduct certain expenses. However, the United States Supreme Court in Lew versus SEC made it clear that that exception only applies if the entire profit of the business results from the wrongful activity. So we go back to the jury's mixed verdict and we go back to Davis's work. We know the entire profit of the business didn't result from the wrongful activity because Trenzio concedes that $486,000, which is about 20% of the total revenue that PCS generated, was lawful, not unlawful activity. So we're in a circumstance where the narrow exception does not apply and therefore it was Trenzio's burden to put on evidence, not just of revenue, but also of costs because it was their burden to put on evidence of net profit and they didn't do it. Thank you. All right. Thank you, Mr. Foster. Mr. Heidler for rebuttal. So, Mr. Heidler, what do you do with KBR's contention in its brief that you forfeited the built-in apportionment argument by failing to raise it in the district court? There's two issues. They say that about the built-in apportionment. They also say that about the entire market value rule. So for built-in apportionment, we briefed the... We raised in our brief a purely legal argument and we cite the authority the court can reach the legal argument for the first time on appeal because it's purely legal. For the entire market value rule, which is where he was focusing, he says we weighed and forfeited reliance on the entire market value rule. Well, you heard my argument. Those words did not come out of my mouth one time. Entire market value rule. And there's a reason. That is not our principal argument. Well, as to your first contention, so that's just discretionary on our part, though, whether we would consider a legal argument that you didn't make in the district court. Yes, Your Honor. That's discretionary. For the entire market value rule, though, we are not principally relying on that rule. Just like the courts in O2 Micro and in Bishop did not rely on the entire market value rule. They said a lump sum damages number can support a reasonable royalty for misappropriation of an important subset of trade secrets if you have the right kind of evidence. The jury in this case had that kind of evidence and it was entitled to make the damages findings in accordance with the correct instructions on the law it was given. He says that Pastore, our damages expert, admitted that he had no way to value anything other than all 10 trade secrets. That is not true. Pastore was asked very specific questions on cross-examination. On 11192-93, he is asked, do you have an opinion that would let the jury value any one trade secret in isolation? He said no, that's not his damages model. He did not do built-in apportionment. He was also asked on 11194, do you have an opinion that would allow the jury to award a smaller amount of damages if it finds misappropriation of fewer than all trade secrets? He said no, because that also is not his damages model. His damages model is you pay the customary full package price for the technology if the license covers the core trade secrets that would enable a competitor to compete with TrendCO in the marketplace. That was his damages model. How does it affect that model when your friend on the other side just said the jury found only two out of those five? So great question. This goes to what is the jury's role? The jury is responsible for hearing all the evidence, reconciling the evidence, crediting evidence that can credit, discrediting evidence that can discredit. And on Rule 50 and on this appeal, we assume the jury did that in a way that supports his verdict. What he's doing is mangling testimony in a way to contort it so it sounds like he's saying there's five trade secrets. He's not. If you read his testimony and look at tab two of my oral argument exhibits, Jerry Blaine was clear. There are, he said there are three core trade secrets. The oligomerization reactor, the steam debault process, and the thermal stabilizer. The thermal stabilizer, the jury said that's not a core trade secret. The jury's entitled to do that, okay? So that leaves two core trade secrets. What evidence is there in the record of methodology for the jury to use to decide how to value these core trade secrets? So two things, Your Honor. Number one is Thomas Pastore's opinion. He testified that his damages model would be the same as long as KBR misappropriated the core of the technology, the core trade secrets. And we have that evidence, so that's one thing the jury could look at. The other, and connected to it, is the university computing factors for a reasonable royalty, right? And this competitive aspect of the factors is really important because the jury heard that what we were really worried about was granting a license, doesn't matter how many trade secrets, granting a license that would be the key that would enable another company to compete with us. That cuts into our margins, that cuts into our market share. That's what we wanted to avoid. And so the jury could have said, what really matters here is are you licensing the technologies that enable competition, right? And on tabs four and five of my oral argument, Steve Harper explains that the only difference between this technology, Dow Transio technology, and the others on the marketplace is the steam de-volatilization process core trade secret. What's the bottom line relief you're looking for, Pete? You're looking for a new trial? What are you looking for? Your Honor, we want the jury's award to be reinstated. The jury did its job. It heard the evidence over weeks of trial, and it was instructed to value the misappropriated technology and no more. They asked for a calculator twice. They went over the evidence. They asked questions about the evidence, and they awarded $50 million. And we ask the court to reinstate that $50 million damages award. All right, thank you, Mr. Heidler. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.